# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
### AT COVINGTON

CIVIL ACTION NO. 07-131-DLB

HAROLD C. WALLACE                                                        PLAINTIFF


vs.                          **MEMORANDUM OPINION & ORDER**


**MIDWEST FINANCIAL & MORTGAGE SERVICES, INC., ET AL.**          **DEFENDANTS**

\*      \*      \*      \*      \*      \*      \*

Plaintiff Harold Wallace avers that he was the victim of a scheme, perpetrated by various individuals and corporate entities, to defraud him by inducing him to enter into a large, high-interest mortgage with unfavorable terms through the use of fraudulent real estate appraisals. Plaintiff's Second Amended Complaint (Doc. #132) alleges violations of the Racketeering Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c)-(d), 1964 (c); the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1667f; and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601-2617; in addition to claims arising under Kentucky state law for breach of contract, fraud, breach of fiduciary duty, and conspiracy.

This matter is currently before the Court on two motions for summary judgment: 1) Defendants Midwest Financial & Mortgage Services, First Financial Home Lending, Inc., David Schlueter and Bryan Bates' Motion for Summary Judgment (Doc. #146), and 2) Defendant MortgageIT, Inc.'s Motion for Summary Judgment (Doc. #149). Both motions have been fully briefed (Docs. #150, 151, 155, 156), and the Court heard oral argument on

July 2, 2010.  Plaintiff was represented by Edward L. Jacobs, William H. Blessing, and Angela Wallace; Defendants Midwest Financial & Mortgage Services, Inc., David Schlueter, Bryan Bates, and First Financial Home Lending, Inc. were represented by Michael Sutton; and Defendant MortgageIT, Inc. was represented by Matthew W. Breetz and Richard Vance.  Thus, the motions are ripe for review.

For the reasons that follow, because Plaintiff has demonstrated the existence of a genuine issue of material fact as to several of his claims, both motions for summary judgment will be **granted in part** and **denied in part**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In October 2004, Harold Wallace purchased a new construction home at 2290 Berkshire Court in Florence, Kentucky for $272,316.  (Doc #150, Ex. P).  Wallace financed the purchase with an 80% loan-to-value option adjustable rate mortgage ("option ARM") from Washington Mutual.[1]  *Id.*  Approximately a year and a half later, Wallace obtained a $164,500 equity line of credit from Home Equity of America, Inc.[2]  (Doc. #163, Ex. 10).

In the summer of 2006, Wallace became interested in refinancing his existing loans and obtaining additional funds to pay for the renovation of his basement.  The parties dispute exactly how Wallace came into contact with Midwest Financial & Mortgage Services, Inc. ("Midwest Financial"), a Kentucky mortgage brokerage owned and managed by David Schlueter and Bryan Bates.  Wallace claims he responded to a mailed advertisement while Defendants contend that Wallace was referred to Midwest Financial by a home remodeler

---

[1] Wallace paid $54,464.00 at closing and financed the remaining $217,852.  (Doc. #150, Ex. P).

[2] This line of credit was sold or transferred - on an unspecified date - to Fifth Third Bank, and is referred to in the parties' submissions as the "Fifth Third loan."

who had bid on Wallace's basement project. Regardless of this disagreement, it is undisputed that on July 31, 2006, Shane Soard, a Senior Loan Officer with Midwest Financial, called Wallace and arranged for the two to meet that evening at Wallace's home.

At their initial meeting, Wallace and Soard discussed Wallace's desire to procure $42,500 to finance his basement renovation, and Wallace completed a loan application. At the close of their meeting, Soard provided Wallace with a number of documents, including: a Good Faith Estimate of Settlement Charges, a Mortgage Loan Origination Disclosure, and an Adjustable Rate Mortgage Loan Disclosure Statement. Wallace signed each document, acknowledging its receipt. (Doc. #149, Ex. D, E).

Following the submission of Wallace's loan application, Dan Bowman, Midwest Financial's office manager, arranged for Accupraise, Inc., a real estate appraisal company located outside of Cleveland, Ohio, to appraise Wallace's home. Accupraise, Inc. subsequently provided Midwest Financial with a Uniform Appraisal Report which valued Wallace's home at $500,000. (Doc. #149, Ex. F). Soard called Wallace to inform him that his home had appraised for nearly double what Wallace had paid only two years before and that, due to Wallace's high credit score (745), he was eligible for a $500,000 loan. Wallace denied interest in such a large loan, and reiterated to Soard that he was only looking to refinance his existing loans and borrow an additional $42,500 to finish his basement.

Approximately a day later, Soard called and told Wallace that he qualified for a $425,000 loan. During this phone conversation, Wallace and Soard agreed on the terms of the loan and set the loan closing for August 18, 2006. However, their agreement was never put into writing, and the parties present differing accounts of the conversation. Wallace contends that instead of presenting a range of loan options, Soard "steered" him

toward an option ARM – a complex loan product whose terms Wallace alleges he did not understand. In contrast, Soard asserts that he offered to provide Wallace with a 30-year fixed-rate mortgage, but that Wallace specifically requested an option ARM despite Soard's explanation of the nature of such loans and admonition that if Wallace only made the "minimum payment" each month "he would never catch up."

Midwest Financial then submitted Wallace's loan application, home appraisal and other documentation to MortgageIT, Inc., a New York mortgage lender, for approval. Based on the appraisal and Wallace's excellent credit history, MortgageIT. Inc. approved, underwrote, and funded a $425,000 option ARM with a 3-year pre-payment penalty.

The loan closed at Plaintiff's home on August 18, 2006. The closing was attended by Wallace, Soard, and a representative of Federated Land Title Agency, Inc. ("Federated"), a title and closing company contracted to handle the closing by Midwest Financial. During the closing, the agent from Federated reviewed each loan document with Wallace, including the Note, Mortgage (which included a pre-payment penalty rider and an adjustable rate rider), HUD-1 Settlement Statement, and the Truth in Lending Disclosure. Wallace signed each document. (Doc. #85, Ex. D; Doc. #106, Ex. N; Doc. #163, Ex. 3). In addition, Wallace was notified in writing that he had three days to rescind the loan. (Doc. #163, Ex. 5).

Four days after the closing, Soard mailed Wallace his $42,046.72 "cash out" check.[3] Wallace used the funds to improve his basement; he built a theater room and a library, created a storm "safe room," and installed a full bath. The cash Wallace received from his

---

[3]Wallace borrowed $425,000.000; out of this amount he paid $207,142.31 to Washington Mutual, $166,746.88 to Fifth Third Bank, and $9,064.09 in loan settlement charges. (Doc. #106, Ex. N).

refinance, however, did not go as far as he expected. Although it enabled him to finish his basement, it was not enough to allow Wallace to fill his newly-renovated space with "toys" such as a pool table and a large-screen TV. Consequently, in November 2006, believing he had at least $75,000 of unused equity left in his home, Wallace began shopping for another loan.

Based upon Wallace's good credit score and his representation that his house had been recently appraised at $500,000 two mortgage brokers offered Wallace low-interest loans. However, these offers were withdrawn once one of the brokers arranged for Wallace's house to be appraised and learned that the property was only worth around $375,000. Unable to refinance, Wallace remains obligated on the $425,000 option ARM.

Wallace filed the instant action on May 23, 2007, alleging that he was the victim of a fraudulent scheme in which Midwest Financial procured an inflated appraisal of his home and induced him to enter into a large adjustable rate mortgage in order to receive an illegal kickback from MortgageIT, Inc. Wallace's Complaint alleged violations of RESPA and TILA, and asserted various state-law claims. (Doc. #1).

Wallace has twice amended his Complaint, adding Defendants and claims with each revision.[4] (Docs. #69, 132). Wallace's Second Amended Complaint alleges nine claims against eight Defendants–including claims for violations of RICO, RESPA, and TILA in addition to several state-law claims–and seeks a variety of relief including treble damages, attorney's fees and costs under RICO; treble damages and attorney's fees for the violation

---

[4] Midwest Financial dissolved in May 2008. Through discovery, Wallace learned that David Schlueter and Bryan Bates, who owned and managed Midwest Financial prior to its dissolution, are the current owners of First Financial Home Lending, Inc. ("First Financial"), another mortgage brokerage. Wallace added First Financial as a Defendant based upon his belief that it is the successor-in-interest to Midwest Financial.

of RESPA; damages, rescission of his loan, and attorney's fees and costs under TILA; compensatory damages for the aggravation, embarrassment, and mental strain caused by Defendants' conduct; punitive damages; and a declaratory judgment that Defendants' conduct violated the law. (Doc. #132).

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is not a genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence, and draw all reasonable inferences, in favor of the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 465 U.S. at 586, it must produce evidence showing that a genuine issue remains, *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

## B.    Civil RICO

The Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961-68, provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]."  18 U.S.C. § 1964(c).  Section 1962 contains RICO's criminal provisions.  Specifically, § 1962(c), upon which primarily Wallace relies, makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Therefore, in order to establish a RICO violation, Wallace must prove the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  In addition, Wallace must also show that the injury to his property occurred as a result of the RICO violation.  *VanDenBroek v. Commonpoint Mortgage Co.*, 210 F.3d 696, 699 (6th Cir. 2000).

In his Second Amended Complaint, Wallace alleges that Defendants Schlueter and Bates "conducted the affairs" of the enterprise–Midwest Financial–through a pattern of racketeering activity, and that they "participated in the management and control of the enterprise."  (Doc. #132 at 25).  Specifically, Wallace contends that Schlueter and Bates committed mail and wire fraud–RICO predicate acts–when they knowingly procured and paid for inflated appraisals from Defendants Andrew Brock and Accupraise, Inc., and that the false appraisals were used to fraudulently induce borrowers, such as Wallace, to enter into unfavorable high-interest loans from MortgageIT, Inc. so that Midwest Financial could collect large yield spread premium payments from that lender.

As detailed below, even if Wallace could establish that Schlueter and Bates violated RICO, his claim nevertheless fails because he cannot show the requisite causation, *i.e.*, he cannot prove that his alleged injuries were caused "by reason of" the alleged RICO violation.

## 1. Proximate Cause

In *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992), the Supreme Court set forth the standard of causation that applies to civil RICO claims. The Court explained that, in order to maintain a civil claim under RICO, a plaintiff is required to demonstrate that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id.* at 268. Proximate cause for the purposes of RICO, the Court stated, is to be evaluated in light of its common-law foundations and therefore requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*

Consequently, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *see Hemi Group, L.L.C. v. City of New York*, 130 S. Ct. 983, 991 (2010) ("[I]n the RICO context, the focus is on the directness of the relationship between the conduct and the harm."). This inquiry is paramount because RICO only provides compensation for injuries which are directly caused by those specific unlawful acts which form the basis of the RICO violation. *Anza*, 547 U.S. at 457 ("[T]he compensable injury flowing from a [RICO] violation . . . 'necessarily is the harm cause by [the] predicate acts.'"(quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985))); *Sedima*, 473 U.S. at 497 ("Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.").

8

If a plaintiff is unable to show a direct link between his claimed injuries and a RICO predicate offense, his civil RICO claims fails as a matter of law for want of a compensable injury caused "by reason of" a RICO violation. 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ."); *Saro v. Brown*, 11 F. App'x 387, 389 (6th Cir. 2001) ("A plaintiff cannot allege merely that an act of racketeering occurred and that he suffered. He must show a causal connection between his injury and a predicate act. If no injury flowed from a particular predicate act, no recovery lies for the commission of that act."). Thus, in order for his civil RICO claim to survive summary judgment, Wallace must show that the inflated appraisal ordered by Midwest Financial and prepared by Accupraise, Inc. led directly to his claimed injuries. This, however, he cannot do.

In his response in opposition to Defendants' summary judgment motion, Wallace asserts that "the gravamen of [his] injury is the additional fees, interest costs, and other expenses for this property he has been forced to pay or become obligated for as a result of the injurious conduct alleged." (Doc. #150 at 23). These injuries, however, are unrelated to the inflated appraisal, which only influenced the size of Wallace's loan. Instead, they flow from the high interest rate and unfavorable terms of his adjustable rate mortgage, which were the product of negotiation between Wallace and Shane Soard and were not wholly determined by the magnitude of the loan.[5] To be sure, as Wallace contended at oral

---

[5] For example, if Wallace had received a favorable low-interest $425,000 loan, he would have suffered none of his claimed injuries as they are all dependent on his entering into a mortgage with unfavorable terms and an interest rate higher than he qualified for.

argument, the false appraisal was a "but for" cause of his obtaining a high-cost mortgage; however, it cannot be said that the appraisal itself was the proximate cause of his alleged injuries. Even if–as Wallace claims–fraud separate from the inflated appraisal tainted those negotiations, such fraud is wholly independent of the RICO predicates alleged, and therefore cannot bridge the causal gap between Wallace's injuries and Schlueter and Bates' alleged violation of § 1962(c).

It is significant that the loan transaction at the heart of this case involves the refinancing and consolidation of existing loans rather than the purchase of a new home. In a refinance transaction, the appraisal is performed primarily for the benefit of the lender. The appraised value of the property helps the lender to determine the maximum amount of credit it can safely lend, and ensures that any loan transaction entered into is adequately collateralized. In this context, a falsely inflated appraisal harms only the lender: if the loan based on the false appraisal is foreclosed, the lender is left with an asset that is worth less than the amount loaned to the borrower. No harm flows from the fraudulent appraisal to the borrower – in this case, Wallace. (*See* Doc. #149 at 11 ("[I]f any fraud was present in the appraisal process, it was MortgageIT that stood to be harmed . . . MortgageIT loaned money to Plaintiff in reliance on the appraiser's representation that the collateral for the loan . . . was worth more than the amount of the money loaned. If it was not, it was MortgageIT who would be left without a mode of recovery if Plaintiff was unable to make his loan payments.")). In contrast, when a home is appraised in advance of an initial purchase, the appraisal benefits not only the lender, but also the purchaser: the appraisal prevents the purchaser from overpaying for the property. In this context, an inflated appraisal causes direct harm to the purchaser by causing him to pay more for the property than it is worth.

Additionally, the evidence in the record shows that the inflated appraisal had little influence on the amount of money borrowed by Wallace. Although the fraudulent appraisal valued his home at $500,000, Wallace did not borrow more than was necessary to accomplish his stated goal of refinancing his existing loans and borrowing sufficient funds to cover the cost of finishing his basement. Despite the inflated appraisal, Wallace borrowed only $425,000–roughly $50,000 more than the minimum amount required to pay the $207,142.31 remaining on the mortgage held by Washington Mutual and the $166,746.88 balance of his Fifth Third home equity line of credit.

Because Wallace's claimed injuries were not caused by the commission of a predicate act–the procurement of and payment for the false appraisal–they are not compensable under RICO, and Wallace's civil RICO claim fails as a matter of law.[6]

## C.    RICO Conspiracy

Wallace's failure to show that he was injured "by reason of" a violation of § 1962(c), is also fatal to his RICO conspiracy claim against Defendants Schlueter, Bates, Soard, Andrew Brock, and MortgageIT, Inc. As discussed above, if the claimed injury does not flow from the commission of the established RICO predicates, then there exists no compensable injury under RICO. *Anza*, 547 U.S. at 457 ("[T]he compensable injury flowing from a [RICO] violation . . . 'necessarily is the harm cause by [the] predicate acts.'"(quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)). Consequently, because Wallace was not directly harmed by the alleged acts of mail and/or wire fraud, it is immaterial whether the

---

[6] Because the Court finds that Wallace is unable to satisfy RICO's proximate cause requirement, it need not discuss whether Wallace demonstrated the existence of a genuine issue of material fact as to RICO's four other elements.

Defendants entered into "an illicit agreement to violate the substantive RICO provision." 18 U.S.C. § 1962(d). Without a compensable injury, Wallace's RICO conspiracy claim cannot stand.

### D.    Truth in Lending Act

TILA, which is to be liberally construed in the consumer's favor, *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 621 (6th Cir. 2002), is a consumer protection statute enacted by Congress "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). To accomplish this goal, TILA imposes disclosure requirements on creditors,[7] exposing them to such penalties as money damages, attorney's fees and rescission for failure to comply with TILA's requirements. *See* 15 U.S.C. §§ 1635(a) & (g), 1640(a). Pursuant to its congressionally-delegated authority, the Federal Reserve System's Board of Governors has promulgated regulations, known collectively as "Regulation Z," *see* 12 C.F.R. Pt. 226, to implement TILA's disclosure requirements. "Those regulations, like TILA itself, are entitled to deference." *Sibby v. Ownit Mortgage Solutions,*

---

[7] TILA defines "creditor" as:

a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(f). Under this definition, neither Midwest Financial nor Shane Soard qualify as "creditors;" Plaintiff does not allege that either party "regularly extends . . . consumer credit" or that Wallace's loan was "initially payable" to any party other than MortgageIT, Inc. Consequently, Wallace's TILA claims against Midwest Financial and Shane Soard cannot stand, and are dismissed as a matter of law. *See Cetto v. LaSalle Bank Nat'l Ass'n*, 518 F.3d 263, 269-70 (4th Cir. 2008) (holding that a mortgage broker does not qualify as a "creditor" under TILA); *Robey-Harcourt v. BenCorp Fin. Co.*, 326 F.3d 1140, 1142 (10th Cir. 2003) (same); *Madrigal v OneWest Bank*, No. C-09-3436, 2009 WL 3415387, at *1 (N.D. Cal. Oct. 21, 2009) (same).

*Inc.*, 240 F. App'x 713, 715 (6th Cir. 2007) (citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 560 (1980) ("[I]t is appropriate to defer to the Federal Reserve Board and staff in determining what resolution of [an] issue is implied by the truth-in-lending enactments.")).

Wallace alleges that MortgageIT, Inc. violated TILA by (1) failing to disclose in the loan documentation the "terms and conditions of the negative amortization loan"; (2) "falsely indicating" on the Truth-in-Lending Disclosure Statement (TILDS) that the listed payments would cover principal and interest; and (3) failing to make the disclosures required by 12 C.F.R. § 226.5b. According to Wallace, MortgageIT, Inc.'s failure to comply with TILA entitles him to damages and rescission of his mortgage.[8]

The latter two of these allegations are insufficient on their face to establish liability under TILA. Wallace's second allegation, that the TILDS "falsely indicated that the prescribed payment ($1,804.63) would cover principal and interest," is not supported by the text of that document. Nowhere on the TILDS does it state that the initial amounts listed in the payment schedule include principal and interest. (Doc. #163, Ex. 3). In addition, Wallace cites to no provision of TILA which requires that the TILDS include a statement of whether all payments listed cover principal and interest. Consequently, this claims fails as a matter of law.

Wallace's third allegation is similarly deficient. By its terms, the disclosure requirements in section 226.5b only "apply to open-end credit plans secured by the

---

[8] In addition, Wallace alleges that an incorrect "early" Truth-in-Lending Disclosure Statement (TILDS) filled out by Shane Soard prior to the selection of the MortgageIT, Inc. option ARM violates TILA. However, as Wallace has provided no evidence either 1) that an "early" TILDS was required by TILA; or 2) that MortgageIT, Inc. can be held liable for disclosures made *before* its loan product was selected; and in light of the fact that neither Midwest Financial nor Shane Soard can be held liable for violations of TILA, this claim is dismissed as a matter of law.

consumer's dwelling." 12 C.F.R. § 226.5b. Because the loan Wallace obtained from MortgageIT, Inc. is not a home equity line of credit, MortgageIT, Inc. was not required to make–and Wallace was not entitled to receive–the disclosures detailed in section 226.5b. Therefore, this allegation fails to state a claim under TILA. Because these claims are devoid of merit and must be dismissed, the Court will only discuss Wallace's first TILA claim in detail.

### 1. The Terms of Wallace's Mortgage

The loan at issue in this case is an option adjustable rate mortgage ("option ARM").[9] The terms of the mortgage are contained in the Adjustable Rate Note ("Note") executed by Wallace in connection with the loan. (Doc. #163, Ex. 2). A key feature of Wallace's loan, and of most option ARMs, is an early interest rate adjustment. While the interest rate on the loan is pegged to a variable index and changes over time, for approximately the first two months the loan featured an interest rate of 2.00%. This initial "teaser" rate was used to calculate Wallace's initial "minimum monthly payment," resulting in a low payment of $1,804.63 (which is equal to the monthly payment on a fully amortized thirty-year loan with a two percent interest rate). On October 1, 2006, the loan's interest rate increased substantially. Since that date, the loan has been accruing interest at a variable rate that changes each month and is calculated by adding a 3.45% "margin" to an index equal to the twelve month average of the annual yields on actively traded United States Treasury

---

[9] The term "option" refers to the fact that each month, Wallace was given four payment options to choose from 1) a "minimum payment" representing the minimum amount the lender will accept to keep the loan current; 2) an "interest only payment" which is the amount that would pay the interest portion of the monthly payment at the current interest rate; 3) a "fully amortized payment" representing the amount necessary to pay off the loan (principal and interest) in substantially equal payments; and 4) a "15 year amortized payment" which is the amount required to pay the loan off (principal and interest) within a fifteen year term in substantially equal payments. (Doc. #163, Ex. 2).

Securities adjusted to a constant maturity of one year. Under the terms of the Note, the interest rate may never exceed 9.95%.

Although the interest rate on Wallace's loan rose almost immediately, his minimum monthly payment did not as the Note permits the amount of the minimum payment to be adjusted only once per year. In addition, the Note imposes a "payment cap" on the amount of each annual increase to the minimum monthly payment, limiting such increases to 7.5%. However, if the loan's unpaid principal balance reaches 115% of the loan's original value, the payment cap no longer applies and the loan will reset so that the remaining principal must be paid off in equal monthly payments over the remaining term of the loan. These terms are reflected in the payment schedule detailed in the TILDS provided to Wallace at the closing. (Doc. #163, Ex. 3).

Because Wallace's initial minimum monthly payment was based on the two-percent teaser rate and was not adjusted in tandem with the loan's variable interest rate, beginning October 1, 2006, if Wallace paid only the minimum, his mortgage would accrue interest each month in an amount larger than the minimum monthly payment. Under the terms of the Note, any unpaid interest is added to balance of unpaid principal and itself begins to accumulate interest.[10] This situation is known as "negative amortization," the result of which—in situations in which a borrower's home has been correctly valued—is an ultimate reduction in the borrower's equity.

---

[10] The record does not indicate whether, after discovering the terms of his loan, Wallace opted to pay only the minimum monthly payment or whether he chose to stave off the negative amortization of his mortgage by paying a larger amount each month.

### 2. Failure to Disclose the "Terms and Conditions of the Negative Amortization Loan"

In his Second Amended Complaint, Wallace alleges that TILA's disclosure requirements were violated because "[t]he loan documentation [provided to him] failed to reveal the terms and conditions of the negative amortization loan." (Doc. #132 at 27). According to MortgageIT, Inc., all the requisite disclosures regarding negative amortization were sufficiently set forth in the loan papers and disclosures received and signed by Wallace prior to and during the loan closing.

TILA regulations provide that "[i]f the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year," the lender is required to make certain disclosures regarding the terms of the loan at the time an application form is provided, or before the consumer pays a non-refundable fee. 12 C.F.R. § 226.19(b). Among the required disclosures are "[a]ny rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, *negative amortization*, and interest rate carryover." 12 C.F.R. § 226.19(b)(2)(vii) (emphasis added). The Commentary to section 226.19 clarifies the creditor's obligations:

> A creditor must disclose, where applicable, the possibility of negative amortization. For example, the disclosure might state, "If any of your payments is not sufficient to cover the interest due, the difference will be added to your loan amount." . . . If a consumer is given the option to cap monthly payments that may result in negative amortization, the creditor must fully disclose the rules relating to the option, including the effects of exercising the option (such as negative amortization will occur and the principal loan balance will increase).

12 C.F.R. Pt. 226, Supp. I. Neither section 226.19 nor Regulation Z requires that these disclosures be made in the TILDS itself. *See Chetal v. Am. Home Mortgage*, No. C 09-

02727, 2009 WL 2612312, at *3 (N.D. Cal. Aug. 24, 2009). MortgageIT, Inc. contends that the loan documentation provided to Wallace at the closing–which includes the Note, Mortgage, Adjustable Rate Mortgage Loan Program Disclosure, and Adjustable Rate Mortgage Loan Disclosure Statement–sufficiently apprised him of the *possibility* of negative amortization as required by TILA. The Court agrees.

Wallace expends little effort to support his allegation that the loan documentation provided to him fails to comply with the requirements of TILA. Devoting only two paragraphs (out of forty-three pages) of his response briefs to discussion of his TILA claims, Wallace states that "at no point did [he] receive disclosures or notification as to the terms and conditions of the negative amortization loan, including the fact that the principal balance would be increasing each month." (Doc. #150 at 27). Wallace, however, cites to no case law, specific statutes, or regulations to support his claim that the numerous loan disclosures provided to him throughout the loan process were inadequate under TILA.

Perhaps Wallace's relative silence is due to the fact that several of the documents signed or initialed by him at the closing accurately detailed the terms of his loan and specifically apprised him of the possibility of negative amortization. For example, the Adjustable Rate Mortgage Loan Program Disclosure contains the following warning:

> Beginning with the 13th payment and every 12 months thereafter, we will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal balance in full by the maturity date in substantially equal payments at the interest rate in effect during the month preceding the payment change date. This payment is called the "Full Payment." Except as otherwise provided, your "Limited Payment" will be the payment amount for the month preceding the payment change date increased by no more than 7.5% ("Payment Cap"). Your new "Minimum Payment" will be the lesser of the Limited Payment and the Full Payment. . . . If you pay less than the Full Payment, then the payment may not be enough to cover the interest due, and any difference will be added to your principal balance. This means the

17

balance of your loan could increase. This is known as "negative amortization."
(Doc. #149, Ex. L). Although the language of the disclosure is not elegant, it is exact; it explains both the existence and effect of the payment cap and warns that if any payment other than the Full Payment is made, negative amortization is likely to occur. Consequently, and in the absence of persuasive precedent that the language of the disclosures provided to Wallace was insufficient, the Court holds that Wallace has failed to establish a genuine issue of material fact as to whether MortgageIT, Inc. adequately disclosed the possibility of negative amortization, and this claim is dismissed as a matter of law.

### E.    Real Estate Settlement Procedures Act

Enacted in 1974, RESPA seeks to ensure that home buyers "are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. § 2601(a). Section 8 of RESPA prohibits kickbacks and referral fees,[11] and allows any person charged an illegal fee to recover damages in the amount of three times the fee in addition to attorneys fees and costs.[12] Section 8(c) tempers the

---

[11] Section 8(a) reads: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).

[12] Section 8(d) provides in pertinent part:

Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service. . . . In any private action brought pursuant to this subsection, the court may award to the prevailing party the court costs of the action together with reasonable attorneys fees.

12 U.S.C. § 2607(d)(2), (5).

prohibition on kickbacks by allowing payment "for services actually performed in the making of a loan."[13]

At issue in this case is a lump sum paid by MortgageIT, Inc. to Midwest Financial known as a "yield spread premium," which Wallace contends violated RESPA's anti-kickback provision.

### 1.    Background

At the time of RESPA's enactment, most mortgages were originated and held by savings and loans, commercial banks, and mortgage bankers.  Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10080, 10080 (March 1, 1999) (hereinafter "HUD Policy Statement I).  In recent years, however, the majority of all residential mortgage financing is secured with the assistance of a mortgage broker.  *Id.*  Mortgage brokers provide origination services (such as helping customers to complete loan application forms and obtaining title examinations, property appraisals, and credit reports) and serve as intermediaries between the consumer and the entity funding the loan.  In addition, mortgage brokers typically choose which lending institution will fund the customer's mortgage.

Mortgage brokers receive varying types of compensation for their work in arranging, processing, and closing mortgage loans.  *Id.* at 80081.  In a given transaction, a broker may receive direct compensation from the borrower in the form of an "origination fee" which is usually charged to the borrower at or before closing and is assessed as a percentage of the

_____

[13] Section 8(c) states in relevant part: "Nothing in this section shall be construed as prohibiting . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed . . . ."  12 U.S.C. § 2607(c).

loan amount.  The broker may also charge other direct fees for specific services performed, such as an application fee, document preparation fee, processing fee, etc.  *Id.*  In addition, the broker may receive indirect compensation from the lender who funds the loan in the form of a "yield spread premium".  *Id.*

Yield spread premiums (YSPs) are lump sum payments from the lender to the broker "based on the interest rate and points of the loan entered into as compared to the par rate[14] offered by the lender to the mortgage broker for that particular loan."  *Id.*  When a broker originates an "above par" loan–meaning that the borrower has agreed to enter into a loan which carries an interest rate higher than he qualified for–the excess over par is paid to the broker in the form of a yield spread premium, with the balance being used to finance the borrower's loan.  For example "a loan of 8% and no points where the par rate is 7.50% will command a greater premium for the broker than a loan with a par rate of 7.75% and no points."  *Id.*  Brokers can therefore increase the amount of their compensation in any loan transaction by convincing borrowers to enter into above-par loans.  Because YSPs are initially paid to the broker by the lender, a borrower may be unaware that his broker is receiving any compensation in addition to the direct fees paid at or before closing.  Although the borrower does not directly pay for the YSP, the actual cost of the premium is ultimately borne by the borrower through his loan's higher interest rate.  *See Glover v. Standard Fed. Bank*, 283 F.3d 953, 958 (8th Cir. 2002) ("Regardless of how the broker compensation is handled, all costs are ultimately paid by the borrower, whether through direct fees paid to

_____

[14] The term "par rate" refers to the "rate offered to the broker (through the lender's price sheets) at which the lender will fund 100% of the loan with no premiums or discounts to the broker."  HUD Policy Statement I, at 10081 n.1.

the broker, through the loan principal or through the interest rate arranged with the lender.");
HUD Policy Statement I, at 10081.

### 2. Midwest Financial's Compensation

In this case, Wallace's HUD-1 Settlement Statement[15] reflects that he paid a total of
$9,064.09 in settlement charges at closing. Of that amount, $3,105.00 was paid directly to
Midwest Financial, and consisted of the following fees: 1) a $1,841.00 loan origination fee;
2) a $475.00 appraisal fee; 3) a $39.00 credit report fee; 4) a $250.00 broker fee, and 5) a
$500.00 processing fee. (Doc. #106, Ex. N). In addition, MortgageIT, Inc. also paid
Midwest Financial a YSP of $14, 374.75. *Id.* This payment is identified on Wallace's HUD-1
as "YIELD SPREAD to MIDWEST FINANCIAL." *Id.*

Wallace alleges that the $3,105.00 in direct fees which he paid fully compensated
Midwest Financial for the services it performed in connection with his loan and that the YSP
paid by MortgageIT, Inc., which was not expressly connected to, or paid in exchange for,
any particular service performed by Midwest Financial constitutes an illegal kickback under
RESPA.

### 3. HUD's "Reasonable Relationship" Test

Because the text of RESPA does not directly address whether the payment of a YSP
violates Section 8's anti-kickback provision, HUD–as the administrative agency charged with
enforcing RESPA–has released two policy statements to clarify its position on the legality
of YSPs. *See* HUD Policy Statement I, at 10084; Real Estate Settlement Procedures Act
Statement of Policy 20001-1: Clarification of Statement of Policy 1999-1 Regarding Lender

---

[15] A "HUD-1" is a standardized form, created by the Department of Housing and Urban Development,
which identifies all settlement charges paid by the borrower.

Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed. Reg. 53052 (October 18, 2001) (hereinafter "HUD Policy Statement II"). These policy statements make clear that, although HUD believes that "higher interest rates alone cannot justify higher total fees for mortgage brokers," lender payments to mortgage brokers are not illegal *per se.* HUD Policy Statement I, at 10084. Rather, YSPs may be legal–or illegal–in individual cases or classes of transactions.

To help courts determine whether individual YSPs violate Section 8, the policy statements prescribe the following two-part "reasonable relationship" test:

> In determining whether a payment from a lender to a mortgage broker is permissible under Section 8 of RESPA, the first question is whether goods or facilities were actually furnished or services were actually performed for the compensation paid. The fact that goods or facilities have been actually furnished or that services have been actually performed by the mortgage broker does not by itself make the payment legal. The second question is whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed.

HUD Policy Statement I, at 10084. When applying this test, courts are directed to look not only at the amount of the YSP paid by the lender, but at the broker's total compensation which includes "direct origination and other fees paid by the borrower." *Id.* "Total compensation should be carefully considered in relation to price structures and practices in similar transactions and in similar markets." *Id.*

For the reasons that follow, application of the "reasonable relationship" test to the facts of this case reveals the existence of a genuine issue of material fact as to whether the $17,839.75 earned by Midwest Financial for arranging Wallace's mortgage was reasonably

related to the services[16] it provided. The parties do not dispute that Shane Soard and Midwest Financial performed compensable services in connection with Wallace's loan, including filling out Wallace's loan application, collecting Wallace's financial information, ordering an appraisal, providing loan disclosures, maintaining contact with Wallace throughout the process, and attending the closing. (Doc. #167, 26:15-28:7, 91:11-95:6).

Rather, the parties' disagreement centers upon whether Midwest Financial was

[16] HUD Policy Statement I identifies the following as services normally performed by a mortgage broker in the origination of a loan:

(a) Taking information from the borrower and filling out the application;

(b) Analyzing the prospective borrower's income and debt and pre-qualifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford;

(c) Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available and demonstrating how closing costs and monthly payments could vary under each product;

(d) Collecting financial information (tax returns, bank statements) and other related documents that are part of the application process;

(e) Initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit);

(f) Initiating/ordering requests for mortgage and other loan verifications;

(g) Initiating/ordering appraisals;

(h) Initiating/ordering inspections or engineering reports;

(i) Providing disclosures (truth in lending, good faith estimate, others) to the borrower;

(j) Assisting the borrower in understanding and clearing credit problems;

(k) Maintaining regular contact with the borrower, realtors, lender, between application and closing to appraise them of the status of the application and gather any additional information as needed;

(l) Ordering legal documents;

(m) Determining whether the property was located in a flood zone or ordering such service; and

(n) Participating in the loan closing.

HUD Policy Statement I, at 10085.

overpaid for the actual services it did provide. Wallace argues that "Midwest provided no facilities, goods, or services . . . which would be reasonably related to the compensation Midwest received . . . ." (Doc. #151 at 9). In support of this argument Wallace offers the expert report of Richard Ambrose, a mortgage broker with over 18 years of experience in the Cincinnati/Northern Kentucky area. (Doc. #151, Ex. B). Ambrose opines that the average mortgage broker would expend between four and eight hours of work originating a loan such as Wallace's, and charge around $4,250.00–or 1% of the total loan amount– for the services provided. *Id.* Therefore, in Ambrose's estimation, the total compensation received by Midwest Financial–approximately 4.2% of the total amount of Wallace's loan–"grossly exceeded the value of the goods, facilities, and services provided for Wallace." *Id.*

For its part, MortgageIT, Inc. contends that the total compensation paid to Midwest Financial is within the range of payment received by other mortgage brokers in connection with similar loans. MortgageIT, Inc. relies on the expert report of Michael Aneiro, a investment manager with 18 years experience focusing in the management of single family mortgage assets.[17] (Doc. #149, Ex. J). Analyzing the rate sheets from MortgageIT, Inc. and four other originators, and "focusing on how MortgageIT compared in yield spread premiums paid to brokers by other originators," Aniero concluded:

---

[17] Defendants Schlueter, Bates, Midwest Financial and First Financial provide no support–either in the form of expert testimony or citations to legal authority–for their contention that "[t]he YSP was compensation, paid by MortgageIT to Midwest, for its services provided in the loan transaction and reasonable compensation for the mortgage brokerage services provided by Midwest." (Doc. #146 at 22). Perhaps in recognition of their complete failure to support the argument that the large amount of compensation received in connection with Wallace's loan was reasonable, at oral argument, counsel for these Defendants conceded that he could not name any specific services provided to Wallace by his clients that justified the size of the yield spread premium.

> [i]n light of . . . the comparative yield spread premium amounts of the competitors to MortgageIT . . ., the services rendered by Mr. Soard, and the structure of Mr. Wallace's loan allowing him great flexibility in the management of his loan balance, it is my opinion that the yield spread premium was reasonable in the context of the mortgage market at the time that the loan was made.

*Id.* However, in contrast to Ambrose's testimony which specifically addresses both prongs of HUD's "reasonable relationship" test, Aniero's analysis and conclusions fail to address the question central to the parties dispute: whether the *total* compensation paid to Midwest Financial was reasonable and in line with the compensation earned by other brokers for similar transactions in similar markets. Aniero's focus on the yield spread premiums paid by MortgageIT, Inc. and similar lenders–rather than total compensation–and his reliance on rate sheets provided to brokers in Arkansas, Florida, Georgia, and Louisiana renders his opinions of little use to the Court in resolving the issue at hand. In view of the conflicting evidence before the Court regarding the reasonableness of the total compensation received by Midwest Financial, the Court cannot determine as a matter of law whether the YSP paid by MortgageIT, Inc. constitutes an illegal kickback under RESPA.[18] Consequently, summary judgment on Wallace's RESPA claim is not appropriate.

## F. Breach of Contract

In his Second Amended Complaint, Wallace alleges that six Defendants (MortgageIT,

---

[18] Although the reasonableness of total compensation is to be assessed in relation to the compensation received in similar markets, the Court notes that other courts that have considered the legality of YSPs have generally found payments above 2.5% of the total loan value to be unreasonable. *See Valdez v. Downey Sav. & Loan*, No. C 06-2541, 2008 WL 4452116, at *2 (N.D. Cal. Oct. 3, 2008) (finding total compensation of 4.5% "disproportionate" to the services provided); *Clifford v. FMF Capital, L.L.C.*, No. 1:06-cv-316, 2007 WL 1701816, at *3 (W.D. Mich. June 11, 2007) (finding 4.4% total compensation to be "grossly out of the range of reasonable compensation"); *Dominguez v. Alliance Mortgage Co.*, 226 F. Supp. 2d 907, 911 (N.D. Ill. 2002) (finding 2.5% total compensation to be reasonable); *McCrillis v. WMC Mortgage Corp.*, 133 F. Supp. 2d 470, 474-75 (S.D. Miss. 2000) (finding 2.3% total compensation to be reasonable). *But see McWhorter v. Ford Consumer Fin. Co.*, 33 F. Supp. 2d 1059, 1068 (N.D. Ga. 1997) (finding 4% total compensation to be reasonable).

Inc., Midwest Financial, Shane Soard, David Schlueter, Bryan Bates, and Accupraise, Inc.) each breached contracts with Wallace by "failing and refusing to provide the services that they promised." Under Kentucky law, "[t]o prove a breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007).

Defendants Midwest Financial, David Schlueter, and Bryan Bates do not dispute the existence of a brokerage contract between Midwest Financial and Wallace. Rather, they argue that a breach of contract claim cannot be maintained against them because 1) only Midwest Financial was a party to the contract with Wallace; and 2) Midwest Financial "acted in accordance with the terms of the mortgage brokerage contract." (Doc. #146 at 20). The Court is unable, however, to resolve as a matter of law any issues related to the brokerage contract because no party has placed a copy of the contract in the record. Consequently, Defendants Midwest Financial, David Schlueter, Bryan Bates' motion for summary judgement on Wallace's breach of contract claim is denied.

Wallace's two contracts with MortgageIT, Inc.–the Adjustable Rate Note and Mortgage–*are* in the record. (Doc. #163, Ex. 2). Wallace alleges that MortgageIT, Inc. breached the terms of the Note by charging interest in excess of the Note's 9.95% limit. As MortgageIT, Inc. aptly observes, however, Wallace points to no evidence in the record to support his claim. Indeed, Wallace's deposition testimony directly contradicts his assertion that he has been charged excess interest. When asked by counsel for MortgageIT, Inc. whether his loan's interest rate has ever exceed the 9.95% cap, Wallace replied "To this date, no, it has not." (Doc. #169, 85:19-22). In light of this testimony, Wallace's bald

assertion that "MortgageIT did not perform per the terms of the agreement" is insufficient to satisfy his evidentiary burden on summary judgment. Accordingly, Wallace's breach of contract claim against MortgageIT, Inc. fails as a matter of law.

### G. Scheme of Fraud

Wallace's fraud claim is based upon misrepresentations and omissions allegedly made by Shane Soard during the loan procurement process. Specifically, Wallace contends that Soard failed to disclose the terms (and consequences) of the option ARM, affirmatively misrepresented that Wallace's mortgage payments would include both interest and principal, and falsely stated that the appraisal of Wallace's home was professionally done and reliable. For their part, Midwest Financial and Soard dispute Wallace's claimed innocence as to the terms of the option ARM and assert that not only did Wallace understand the nature of adjustable rate mortgage, but also that he specifically requested an option ARM.

It is well-established that, under Kentucky law, a plaintiff seeking to prevail on a claim of fraud by misrepresentation must establish six elements:

> (1) that the declarant made a material misrepresentation to the plaintiff, (2) that this misrepresentation was false, (3) that the declarant knew it was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.

*Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. Ct. App 2007) (citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)). Fraud by omission, however, is not the same as fraud by misrepresentation, and has substantially different elements. In order to establish a case of fraud by omission, a plaintiff must show that the defendant "(1) had a duty to disclose a material fact; (2) failed to disclose that fact; (3) which induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a result." *Associated*

*Warehousing, Inc. v. Banterra Corp.*, No. 5:08-cv-52, 2008 WL 4180260, at *3 (W.D. Ky. Sept. 8, 2008) (citing *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003)).  "A duty to disclose facts is created only where a confidential or fiduciary relationship between the parties exists, or when a statute imposes such a duty, or when a defendant has partially disclosed material facts to the plaintiff but has created the impression of full disclosure."  *Rivermont Inn, Inc.*, 113 S.W.3d at 641 (citing *Dennis v. Thompson*, 43 S.W.2d 18 (Ky. 1931)).

The parties present very different accounts of the content and effect of Soard's conversations with Wallace prior to the loan closing.  Thus, the Court is faced with a classic case of dueling depositions that raise contested issues of fact.  As the record contains no clear account of exactly what Soard said–or failed to say–during the loan negotiations with Wallace, there exist genuine issues of material fact with respect to each element of Wallace's fraud claims.  Therefore, Midwest Financial's motion for summary judgment is denied as to this claim.

### H.    Breach of Fiduciary Duty

In his Second Amended Complaint, Wallace maintains that Midwest Financial and Shane Soard, as his mortgage brokers, owed him a fiduciary duty which they breached by failing "to make full disclosure of all pertinent financial terms and to provide him with the best loan rates available."  Although Wallace presents the existence of a fiduciary duty as a given, under Kentucky law in force at the time Wallace refinanced his home, the existence of a fiduciary duty between a mortgage broker and borrower depended on whether the

broker made certain disclosures prior to obtaining financial information from the borrower.[19]

In 2006, Kentucky Revised Statutes § 286.8-270 provided in pertinent part:

> A mortgage loan broker may act as agent for the person or persons, if an individual or individuals, attempting to obtain a mortgage loan. The mortgage loan broker shall clearly and conspicuously disclose to the person or persons attempting to obtain a mortgage loan whether the mortgage loan broker is acting as an agent for that person or persons, in a separate writing, and provide such disclosure to the person or persons attempting to obtain the mortgage loan before any personal financial information may be obtained by the mortgage loan broker.

Ky. Rev. Stat. § 286.8-270 (2006). Under this statute, a mortgage broker could prevent the formation of a fiduciary relationship simply by affirmatively disclosing his intention not to act as the borrower's agent. However, if the broker chose to become the agent of the borrower, that choice carried with it a duty to act in the best interest of the borrower. *See Sweet v. Slusher*, No. 2007-CA-001245-MR, 2009 WL 792547, at *3 (Ky. Ct. App. Nov. 18, 2009) ("Kentucky's courts have defined agency as 'the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" (quoting *Phelps v. Louisville*

---

[19] In 2008, the Kentucky legislature rewrote section 286.8-270, so that it now delineates the exact nature of the duties owed by mortgage brokers to their customers. The current section 286.8-270(1) reads:

A mortgage loan broker shall comply with the following duties:

(a) A mortgage loan broker shall exercise good faith and fair dealing, shall act in the best interest of the borrower, and shall not compromise a borrower's right or interest in favor of another's right or interest;

(b) A mortgage loan broker shall disclose to borrowers all material facts of which the mortgage loan broker has knowledge that might reasonably affect the borrower's rights, interests, or ability to receive the borrower's intended benefit from the residential mortgage loan; and

(c) A mortgage loan broker shall provide a written accounting to a borrower for all the borrower's money and property received by the broker.

Ky. Rev. Stat. § 286.8-270 (2010).

*Water Co.*, 103 S.W.3d 46, 50 (Ky. 2003))).

As it currently stands, the record is unclear as to whether Shane Soard and/or Midwest Financial agreed to act as Wallace's agent with respect to the refinancing of his home. The mortgage brokerage contract between Wallace and First Financial was never entered into the record, and no party has addressed whether Soard (or any other representative of Midwest Financial) made the required disclosures prior to obtaining Wallace's financial information.[20] As this factual issue currently remains unresolved, Defendant Midwest Financial's motion for summary judgment as to Wallace's breach of fiduciary duty claim is denied.

## I. Civil Conspiracy

Wallace's civil conspiracy claim is, in essence, a state-law reiteration of his failed RICO conspiracy claim. Wallace alleges that Andrew Brock and Accupraise, Inc. conspired with Midwest Financial, David Schlueter, Bryan Bates and Shane Soard to produce fraudulent appraisals intended to induce Midwest Financial's customers to enter into large adjustable rate mortgages so that Midwest Financial could receive unlawful kickbacks from MortgageIT, Inc. Even though Wallace alleges that all seven Defendants were involved in one large conspiracy, it is more accurate to view his allegations as describing two schemes: one between the Midwest Financial, David Schlueter, Bryan Bates, Shane Soard, Accupraise, Inc. and Andrew Brock to produce and disseminate fraudulent appraisals; and another between Midwest Financial, David Schlueter, Bryan Bates, Shane Soard and

---

[20] Neither Wallace nor the broker Defendants addressed the merits of Wallace's breach of fiduciary claims in their briefs to the Court. Additionally, during oral argument, counsel for each side admitted that they were unaware that the current language of section 286.8-270 was not in effect at the time Wallace did business with Midwest Financial.

MortgageIT, Inc. to pay illegal kickbacks in the form of large yield spread premiums.

In Kentucky, civil conspiracy is defined as "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means." *Smith v. Bd. of Educ. of Ludlow*, 94 S.W.2d 321, 325 (Ky. 1936). Technically speaking, there is no such thing as a cause of action in Kentucky for civil conspiracy as the recognized cause of action "is for damages caused by *acts* committed pursuant to the formed conspiracy." *James v. Wilson*, 95 S.W.3d 875, 896 (Ky. Ct. App. 2002) (emphasis added). In the absence of acts done by one or more conspirators and resulting in damage, "no civil action lies against anyone since the gist of the civil action for conspiracy is the act or acts committed in pursuance of the conspiracy, not the actual conspiracy." *Davenport's Adm'x v. Crummies Creek Coal Co.*, 184 S.W.2d 887, 888 (Ky. Ct. App. 1945).

Wallace's civil conspiracy claim fails as to each Defendant, although for different reasons. The alleged conspiracy between the broker Defendants and Accupraise, Inc. is not actionable because, as discussed in Section C above, the unlawful acts committed by those Defendants–the creation and dissemination of fraudulent appraisals–did not damage Wallace. *See Davenport's Adm'x*, 184 S.W.2d at 888 ("A necessary allegation is that the damage or death resulted from some overt act done pursuant to or in furtherance of the conspiracy.").

Similarly, Wallace's claims in connection with the claimed conspiracy between the broker Defendants and MortgageIT, Inc. cannot stand because Wallace has presented no evidence which establishes that those Defendants entered into an agreement to commit an unlawful act. As discussed previously, yield spread premiums are not illegal *per se* under

RESPA.  The legality of such payments is determined by comparing the actual services and facilities provided by the broker to the total compensation received in connection with the loan at issue, and asking whether the two are "reasonably related."  At the time MortgageIT, Inc. agreed to pay the $14,374.75. yield spread premium to Midwest Financial, it had no way of determining whether the payment violated RESPA.  The record does not indicate that prior to accepting payment of the YSP Midwest Financial apprised MortgageIT, Inc. of the exact services it provided to Wallace.  Indeed, for all MortgageIT, Inc. knew, Wallace had agreed to enter into a high-interest loan in order to reduce his up-front closing costs. Because the legality of the YSP was not determined at the time it was paid, it cannot be said that MortgageIT, Inc. conspired to commit an *unlawful* act.  Consequently, Wallace's civil conspiracy claim fails as a matter of law as to all Defendants.

### J.    Successor Liability

Wallace alleges that First Financial is liable, as a successor-in-interest, for any wrongdoing committed by Midwest Financial.  "The general rule regarding liability of a corporate successor in Kentucky is that a purchasing corporation does not assume liability for the debts and liabilities of the selling corporation."  *Parker v. Henry A. Petter Supply Co.*, 165 S.W.3d 474, 478 (Ky. Ct. App. 2005).  Pursuant to this general rule, First Financial contends that, as an entity that merely purchased some of Midwest Financial's furniture, fixtures, and equipment, and hired a number of former employees of Midwest Financial, it cannot be held responsible for any of Midwest Financial's debts or liabilities.

However, Kentucky recognizes four exceptions to the general prohibition against successor liability:

(1) where the purchaser expressly or impliedly agrees to assume such debts

32

or other liabilities; (2) where the transaction amounts to a consolidation or merger of the seller and purchaser; (3) where the purchasing corporation is merely a continuation of the selling corporation; or (4) where the transaction is entered into fraudulently in order to escape liability for such debts.

*Conn v. Fales Div. of Mathewson Corp.*, 835 F.2d 145, 146 (6th Cir. 1987). Wallace argues that there is sufficient evidence in the record to raise a genuine issue of material fact as to whether First Financial and Midwest Financial entered into a de facto merger. The Court agrees.

The following factors guide the Court in its determination whether to apply the de facto merger doctrine:

(1) continuity of management, personnel, location, assets, and general business operations; (2) continuity of shareholders which results from the purchasing corporations paying for the acquired assets with shares of its own stock; (3) whether the seller corporation ceases business operation and liquidates or dissolves as soon as is legally or practically possible; (4) whether the purchasing corporation assumes the obligations of the sellers which are ordinarily necessary for the continuation of the seller's normal business; and (5) adequacy of the consideration received by the selling corporation.

*Ogle v. U.S. Shelter Corp.*, No. 95-51, 1996 WL 380707, at *5 (E.D. Ky. Apr. 25, 1996). Two pieces of evidence in the record call into question the separateness of Midwest Financial and First Financial and establish the existence of genuine issues of material fact regarding whether the two corporations entered into a de facto merger. The first is a letter from David Schlueter to the Kenton County Fiscal Court dated April 17, 2008; the letter reads in pertinent part: "Please close the Midwest Financial & Mortgage Service Inc. account #38493000 effective June 30, 2008. This company is merging with First Financial Home Lending Inc." (Doc. #150, Ex. P).

The second is the deposition testimony of Misty Goetz, a former employee of Midwest Financial who now works for First Financial. (Doc. #150, Ex. M). According to

33

Goetz, Midwest Financial closed its doors on April 30, 2008 and opened the next day as First Financial: "April 30th I was told that we were no longer going to be the company of Midwest and we were offered jobs with First Financial. So when I walked in on May 1st, I had a job with First Financial." (Doc. #150, Ex. M, 38:4-10). When asked by Wallace's counsel how the operations of the two companies differed, Goetz answered that the only difference was the corporate name: "I was employed by Midwest on April 30th. On May 1st, I was employed with First Financial." (Doc. #150, Ex. M, 39:11-18).

These two pieces of evidence, when considered in conjunction with the undisputed facts concerning the common business, ownership, and location of the two corporations, create sufficient factual uncertainty as to prevent the Court from resolving of the issue of successor liability as a matter of law. Indeed, at oral argument, although counsel for Midwest Financial and First Financial contended that the letter to the Kenton County Fiscal Court was a "mistake," he conceded that the letter's existence created a "jury question" as to successor liability. Consequently, First Financial's motion for summary judgment as to this claim is denied.

### K.    Claims Against Shane Soard

One final issue deserves comment. Although Shane Soard–who is representing himself in this action–has not filed a motion for summary judgment, the Court will grant summary judgment in his favor as to Counts II (RICO Conspiracy), III (TILA), and VII (Civil Conspiracy). The Court is aware that it "does not have sweeping authority to enter summary judgment at any time, without notice, against any party," *Employers Ins. Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir. 1995); however, the Court may *sua sponte* grant summary judgment "so long as the losing party was on notice that it had to

come forward with all of its evidence [and had a] reasonably opportunity to respond to all the issues considered by the court." *Bennett v. City of Eastpointe*, 410 F.3d 810, 816 (6th Cir. 2005).

Here, while Soard did not move to dismiss the claims against him, the Court finds that summary judgment in his favor is proper as Wallace will not be prejudiced by the dismissal. The summary judgment motion of Defendants Midwest Financial, David Schlueter, Bryan Bates, and First Financial put Wallace on notice to come forward with all evidence necessary to support his claims, and Wallace had a full and fair opportunity to respond to that motion, which involves the same facts and claims alleged against Soard. *See Doyle v. City of* Columbus, 120 F. App'x 560, 565 (6th Cir. 2004) (holding district court's *sua sponte* grant of summary judgment in favor of one defendant was not an abuse of discretion as summary judgment motions of the other defendants "put [plaintiff] on notice to bring forth all available evidence to support his claim"); Grand *Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 407 (6th Cir. 1999) (holding that there was no abuse of discretion where "the other parties' motions for summary judgment put [plaintiff] on notice" to come forward with sufficient evidence to defeat summary judgment).

### III. CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

1. Defendants Midwest Financial & Mortgage Services, First Financial Home Lending, Inc., David Schlueter and Bryan Bates' Motion for Summary Judgment (Doc. #146) is hereby **GRANTED IN PART** and **DENIED IN PART**;

   a. Summary Judgment is hereby **GRANTED** in favor of these Defendants

as to Counts I (Civil RICO), II (RICO Conspiracy); III (TILA); and VII (Civil Conspiracy);

    b.    Summary Judgment is hereby **DENIED** as to Counts III (RESPA); IV (Breach of Contract); V (Scheme of Fraud); VI (Breach of Fiduciary Duty); and VIII (Successor Liability);

2.    Defendant MortgageIT, Inc.'s Motion for Summary Judgment (Doc. #149) is hereby **GRANTED IN PART** and **DENIED IN PART**;

    a.    Summary Judgment is hereby **GRANTED** in favor of Defendant MortgageIT, Inc. as to Counts II (RICO Conspiracy); Count III (TILA); Count IV (Breach of Contract); and Count VII (Civil Conspiracy);

    b.    Summary judgment is hereby **DENIED** as to Count III (RESPA);

3.    Summary judgment is hereby **GRANTED SUA SPONTE** in favor of Defendant Shane Soard as to Counts II (RICO Conspiracy), III (TILA), and VII (Civil Conspiracy);

4.    As the Joint Notice filed by the parties on July 9, 2010 (Doc. #175) did not address the effect Plaintiff's Chapter 13 bankruptcy filings will have on this case going forward, the parties shall, on or before **August 2, 2010**, file a Joint notice which specifically discusses the impact Plaintiff's bankruptcy will have on mediation and future proceedings in this case; and

5.    This matter is set for a telephonic scheduling conference on **August 11, 2010 at 11:00 a.m.** The Court will initiate the call.

This 16th day of July, 2010.



Signed By:
*David L. Bunning*    DB
United States District Judge

G:\DATA\Opinions\Covington\2-07-131-MOO.wpd