**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

CIVIL ACTION NO. 07-131-DLB-JGW

HAROLD C. WALLACE                                                    PLAINTIFF

vs.                              **MEMORANDUM OPINION & ORDER**

MIDWEST FINANCIAL & MORTGAGE SERVICES, INC., ET AL.          DEFENDANTS

*        *        *        *        *        *        *

Defendants David Schlueter, Bryan Bates, Midwest Financial & Mortgage Services, Inc. (Midwest), and MortgageIT Inc. move for summary judgment on Plaintiff Harold Wallace's remaining Racketeering Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c)-(d), 1964(c), and state civil conspiracy claims.[1] In support of their motions, defendants all raise essentially the same argument: there is no evidence that they participated in, or agreed to, a fraudulent appraisal or illegal kickback scheme. For the reasons stated below, the Court will **grant** summary judgment for Defendants Bates, Midwest, and MortgageIT, and **grant** and **deny in part** summary judgment for Defendant Schlueter.

---

[1] Wallace's Second Amended Complaint also alleged violations of the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1667(f), and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601-2617; in addition to claims arising under Kentucky state law for breach of contract, fraud, and breach of fiduciary duty. (Doc. # 132). The parties reached a settlement on those claims. (Doc. # 218).

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit stems from Plaintiff Harold Wallace refinancing his home mortgage loan. Wallace obtained his refinancing loan through the assistance of Defendant Midwest, a now-dissolved Kentucky brokerage firm that was owned by Defendants David Schlueter and Bryan Bates; and Defendant MortgageIT, a New York mortgage lender.

Wallace purchased his Florence, Kentucky home for $272,000 in October 2004. (Doc. # 150, Ex. P). He financed that purchase by taking out a $217,852 loan from Washington Mutual. (Doc. # 163, Ex. 9). Less than two years later, Wallace took out a second mortgage on his home for $164,500. (Doc. # 163, Ex. 10). Wallace then decided that he wanted to renovate his basement. (Doc. # 149, Ex. A). To pay for the $42,500 renovation, he elected to refinance his mortgage loans so that he would receive a cash-payout. *Id.* Wallace owed approximately $380,000 on his mortgage at the time, so he needed a $422,500 loan to obtain the required funds. *Id.*

In his attempt to acquire a loan, Wallace contacted Shane Soard, a former loan officer at Midwest and a one-time party to this lawsuit. *Id.* On July 31, 2006, Soard returned Wallace's call and arranged to meet him at Wallace's home that evening. *Id.* At the meeting, Soard asked Wallace to complete a loan application. *Id.* After Wallace submitted the loan application, Midwest arranged for Accupraise to conduct an appraisal of Wallace's home. (Doc. # 146, Ex. 8). Accupraise is a now-extinct appraisal company that was based in Cleveland, Ohio and was owned by Andrew Brock; both Accupraise and Brock are former defendants in this action. Wallace's appraisal is at the crux of this lawsuit.

The record reflects that Accupraise never sent an appraiser to Wallace's home. (Doc. # 150, Ex. E). However, Accupraise submitted an appraisal that valued Wallace's

home at $500,000, which Wallace contends was $125,000 more than the home was worth. (Doc. # 149, Ex. F); (Doc. # 163, Ex. 1). Quinton W. Durham, a former employee at Accupraise, declares that his signature on the appraisal is a forgery. (Doc. # 150, Ex. E). According to sworn statements from Durham and another Accupraise employee, Devin Demaske, this was routine practice at Accupraise. (Doc. # 150, Exs. B, E).

After receiving the appraisal, Soard called Wallace to tell him that his house had appraised at nearly twice what he had paid for it less than two years earlier. *Id.* Shortly thereafter, Soard and Wallace agreed to terms on a $425,000 loan. *Id.*; (Doc. 106, Ex. N). Midwest then submitted Wallace's loan application and appraisal to Defendant MortgageIT, a New York mortgage lender. (Doc. # 149, Ex. G). Based on the appraisal, as well as Wallace's income and credit history, MortgageIT approved the loan. (Doc. # 149, Ex. H).

On August 18, 2006, the parties closed on the loan at Wallace's home. (Doc. # 149, Ex. C). In attendance were Wallace, Soard, and a title agent. *Id.* During the closing, the title agent reviewed each loan document with Wallace, including the Note, Mortgage, HUD-1 Settlement Statement, and the Truth in Lending Disclosure. Wallace signed each document. (Doc. #85, Ex. D; Doc. #106, Ex. N; Doc. #163, Ex. 3). In addition, Wallace received written notice that he had three days to rescind the loan. (Doc. #149, Ex. B).

Wallace's loan is referred to as an option adjustable-rate mortgage ("option ARM"). Wallace contends that Soard pushed him towards this complex loan; Soard proclaims that Wallace requested it. (Doc. # 150, Exs. A, L). Although Wallace states that he did not understand the loan, he admits that he reviewed the payment schedule at the closing and was aware that the payments would substantially increase over time. (Doc. # 149, Ex. B).

The loan resulted in MortgageIT paying Midwest a yield spread premium of $14,734.75.[2] (Doc. # 106, Ex. N). This large premium was directly related to Wallace choosing a high-rate loan, and combined with other fees, resulted in MortgageIT paying Midwest a total compensation of 4.197% of the loan. *Id.*

After Wallace paid off his two previous loans and the loan settlement charges, Midwest sent Wallace a $42,046.72 "cash out" check. (Doc. # 106, Ex. N). Wallace used that money to renovate his basement by putting in a library, theater room with surround sound, and full bathroom. (Doc. # 149, Ex. B). In November 2006, Wallace decided that he wanted a pool table and big-screen TV for his basement. (Doc. # 149, Ex. A). He planned to pay for these items by taking out another mortgage, using what he believed was unused equity in his home. *Id.* Wallace alleges that he first learned of Accupraise's inflated appraisal during the process of trying to acquire another loan.

On May 23, 2007, Wallace filed this action against Midwest, Schlueter, Bates, and MortgageIT, in addition to other defendants that have since been dismissed. Wallace alleges that Schlueter and Bates, acting through Midwest, knowingly secured a fraudulent

---

[2] In *Lee v. Countrywide Home Loans, Inc.*, 692 F.3d 442, 445 (6th. Cir. 2012), the Sixth Circuit gave the following explanation of a yield spread premium:

> This industry term describes all expenses that a lender pays to a broker in order to lower the borrower's up-front closing costs and facilitate loan creation. The borrower then repays the lender through a higher interest rate over the life of the loan. The amount of the Yield Spread Premium in each case is determined by looking at the difference between the preset "par rate" and the interest rate on the eventual loan. The par rate represents the interest rate at which the lender would fund 100% of the loan with no premiums. Lenders calculate and communicate the par rate daily to brokers. For a broker to earn any Yield Spread Premium, the borrower's eventual loan must be "above par." The higher the interest rate on the eventual loan, the higher the premium the broker earns, and the easier it will be for the lender to resell the mortgage to investors in the securities marketplace.

appraisal from Brock so that they could entice Wallace to enter into a high-rate mortgage. *Id.* at 5. He contends that Schlueter and Bates then conspired with MortgageIT to obtain illegal kickbacks in the form of yield spread premiums. *Id.* at 4.

Wallace asserted nine claims against eight defendants in his Second Amended Complaint. (Doc. # 132). Since then, this Court granted partial summary judgment for the defendants (Doc. # 176), the parties entered a settlement agreement (Doc. # 218), and there was an appeal, *Wallace v. First Financial & Mortgage Services, Inc.*, 714 F.3d 414 (6th Cir. 2013). The Sixth Circuit reversed this Court's decision granting summary judgment on the RICO claims against Schlueter, Bates, and MortgageIT, and the state conspiracy claims against Schlueter, Bates, and Midwest, finding that Wallace had raised a question of fact as to causation on those claims. *Id.* at 416. The Sixth Circuit affirmed this Court's decision granting summary judgment on the state conspiracy claim against MortgageIT, finding no evidence in the record that MortgageIT conspired to commit an unlawful act. *Id.* at 423.

As a result of that procedural history, three claims and four defendants now remain: (1) a § 1962(c) RICO claim against Schlueter and Bates; (2) a § 1962(d) RICO conspiracy claim against Schlueter, Bates, and MortgageIT; and (3) a Kentucky civil conspiracy claim against Schlueter, Bates, and Midwest. On remand, this Court ordered the parties to file supplemental briefs on the remaining RICO claims. (Docs. # 242, 243, 244, 248, 249, 250). This matter is now ripe for the Court's review.

## II.  ANALYSIS

### 1.    Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  On a summary judgment motion, a court construes the evidence and draws all reasonable inferences in the favor of the nonmoving party. *Ireland v. Tunis*, 113 F.3d 1435, 1440 (6th Cir. 1997).  The moving party has the initial burden of demonstrating that there is no genuine dispute of material fact.  *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).  The moving party can meet this burden by showing that the nonmoving party has failed to produce evidence that creates "a genuine dispute for the jury."  *Id*.; Fed R. Civ. P. 56(e).  The nonmoving party can defeat a properly supported summary judgment motion by pointing to specific facts upon which "a reasonable jury could return a verdict" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### 2.    Section 1962(c) RICO Claim

RICO provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of" one of the statute's prohibited activities listed in 18 U.S.C. § 1962.  18 U.S.C. § 1964(c).  Section 1962(c) makes the following unlawful:

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To establish a § 1962(c) violation, a plaintiff must prove four elements : "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  Further, a plaintiff must demonstrate that the predicate acts

6

"not only [were] a 'but for' cause of his injury, but [were] the proximate cause as well."
*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

Wallace contends that Schlueter and Bates violated § 1962(c) by acting through Midwest to procure fraudulent appraisals from Accupraise, with the purpose of luring mortgage borrowers into taking out larger than necessary loans. The Sixth Circuit held that there is a genuine issue of fact as to whether the alleged appraisal scheme proximately caused Wallace's injury and remanded for this Court to decide the remaining elements. *Wallace*, 714 F.3d at 419. For the reasons stated below, the Court finds that there is a genuine dispute of material fact whether Schlueter violated § 1962(c), but finds no such dispute as to Bates.

### a.    Conduct of an enterprise

RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To bring a successful RICO claim, a plaintiff must prove that there are "two distinct entities: (1) a 'person'; and (2) an 'enterprise' ...." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). Under RICO, it is not the "enterprise" that is liable, it is the "'persons' who conduct the affairs of the enterprise through a pattern of racketeering activity." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 490 (6th Cir. 2013).

In his Second Amended Complaint, Wallace names Midwest as the "enterprise" and alleges that Schlueter and Bates are the "persons" who "conducted the affairs of Midwest through a pattern of racketeering activity." (Doc. # 132 at 25). Schlueter and Bates argue that Midwest cannot be the enterprise for two reasons: (1) Wallace has not

7

demonstrated the existence of an association-in-fact enterprise (Doc. # 146 at 10), and (2) "Midwest cannot join with its own members, Schlueter and Bates, to undertake regular business activity and become an enterprise distinct from itself," (Doc. # 156 at 5). Both arguments lack merit.

First, a plaintiff is not required to prove an association-in-fact enterprise. RICO covers both (1) legal entities, *and* (2) nonlegal entities consisting of groups of individuals associated-in-fact. *U.S. v. Turkette*, 452 U.S. 576, 581-82 (1981). The enterprise definition is expansive and includes a "corporation." 18 U.S.C. § 1961(4). Schlueter and Bates admit Midwest was a corporation during the relevant time period. (Doc. # 134 at 1). Because Wallace has named a legal entity as the enterprise, he does not have to prove there was an association-in-fact enterprise.

Second, when a corporation's owners-employees conduct a corporation's affairs by engaging in predicate RICO acts, there are two distinct entities. *Cedric Kushner Promotions, Ltd.*, 533 U.S. at 166 (holding that a plaintiff bringing a § 1962© claim can name a corporation's owners the "persons" and the corporation the "enterprise" because they are distinct legal entities); *In re ClassicStar Mare Lease Litig.*, 727 F.3d at 492 (stating that individual defendants are always distinct from corporate enterprises because they are legally distinct entities, even when those individuals own the corporation or act only on its behalf). Because Midwest is a corporation and Schlueter and Bates are owner-employees who allegedly conducted Midwest's affairs through predicated RICO acts, Wallace has satisfied the distinctness requirement. Accordingly, Wallace has properly named a RICO enterprise in Midwest.

To demonstrate that Schlueter and Bates "conducted" Midwest's affairs, Wallace simply has to show that they participated in "some part" of the "operation or management of" Midwest. *Reves v. Ernst & Young*, 507 U.S. 170, 179-83 (1993). That element is easily satisfied because Schlueter and Bates admit that they were Midwest's president and vice president. (Doc. # 50, Exs. J,K). Wallace has satisfied the first two elements of a § 1962(c) RICO violation. The Court now turns to whether there is a factual dispute that Schlueter and Bates conducted Midwest's affairs "through a pattern of racketeering activity."

### b. Racketeering acts

Wallace alleges that Schlueter and Bates committed the predicate racketeering acts of mail and wire fraud. 18 U.S.C. § 1961(1) (listing mail and wire fraud as qualifying RICO acts). For Wallace to survive summary judgment, he must put forth specific facts that create a genuine dispute whether Schlueter and Bates engaged in conduct indictable under the mail or wire fraud statutes. *Sedima*, 473 U.S. at 481 (citing § 1961(1)).

Establishing mail and wire fraud involves the same analysis and requires proof of three elements. *United States v. Daniel*, 329 F.3d 480, 486 n.1 (6th Cir. 2003). First, that the defendant "devised or willfully participated in a scheme to defraud." *U.S. v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010). Second, that the defendant used or caused to be used either the mail (for mail fraud) or an interstate wire communication (for wire fraud) "in furtherance of the scheme." *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006)*; United States v. Prince*, 214 F.3d 740, 748 (6th Cir. 2000). And third, that the defendant intended "to deprive a victim of money or property." *Prince*, 214 F.3d at 748.

A scheme to defraud is "any plan or course of action by which someone intends to deprive another . . . of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). To establish a scheme to defraud, a plaintiff must demonstrate scienter – that "the defendant acted with either a specific intent to defraud or recklessness with respect to misleading information." *Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 404 (6th Cir. 2012).

The sworn statements of two former Accupraise employees, Quinton W. Durham and Devin Demaske, establish a scheme to defraud. In his affidavit, Durham identifies five Kentucky appraisals, including Wallace's, that Accupraise prepared for Midwest between 2006 and 2007. (Doc. # 150, Ex. E). Each appraisal bears Durham's signature and states that the appraiser performed a complete visual inspection of the interior and exterior of the home and the neighborhood. *Id.* Durham, however, asserts that he did not work on these appraisals and did not sign the appraisal documents. *Id.* He avers that Brock had his signature scanned into an Accupraise computer and that his signature was electronically forged on the appraisals without his consent. *Id.* Demaske corroborates Durham's statement, declaring that Brock electronically forged his signature on appraisals that he did not prepare. (Doc. # 150, Ex. B). He also states that by 2005 Brock had lost both his Kentucky and Ohio appraiser's license. *Id.* Finally, he states that Brock would send appraisals – through either e-mail or fax – from Accupraise's office in Mentor, Ohio to Midwest's Office in Erlanger, Kentucky. *Id.* Based on these statements, there is evidence of a scheme involving wire fraud that is sufficient to survive summary judgment. The issue is whether Bates and Schlueter were willing participants in the scheme.

10

In his deposition, Schlueter denies exerting influence over or being involved in Accupraise's work for Midwest.  (Doc. # 146, Ex.6).  In their summary judgment motion, Schlueter and Bates argue that there is no evidence that they knew Brock's appraisals were fraudulent or that they participated in the appraisal process.  They suggest that the evidence before the Court is merely that Midwest ordered the appraisals from Accupraise and then sent them on to the lender.

Demaske's sworn statement contradicts Schlueter's arguments.  Demaske reports that he worked for Accupraise from early 2003 until the summer of 2005, during which time he and Brock lived together.  (Doc. # 150, Ex. B).  He states the following with respect to Midwest:

- By the time he left Accupraise in the summer of 2005, nearly 100% of Accupraise's business came from Midwest

- When Midwest would order an appraisal, it would send a fax to Accupraise that requested a certain appraisal value; Brock would then comply with that request, prepare the appraisal, and send it by fax or e-mail to Midwest's Kentucky office

- Midwest employees assisted in the appraisal process by taking pictures of subject and comparable properties, and Brock would pay them for their work

Demaske states the following with respect to Schlueter:

- He has communicated with Schlueter, and was present when Brock spoke on the phone almost daily with Schlueter regarding appraisals

- He was present on a trip to Cincinnati where Brock socialized with Schlueter; Brock socialized with Schlueter and other Midwest employees frequently

11

- Schlueter knew that Brock did not personally visit the properties Accupraise appraised in Northern Kentucky

(Doc. # 150, Ex. B).

Taken as true and viewed in the light most favorable to Wallace, Demaske's declaration creates a genuine dispute of material fact regarding Schlueter's participation in the fraudulent appraisal scheme. It suggests that Midwest employees exerted influence over, and were directly involved in, the appraisal process. It establishes that Schlueter and Brock had a relationship beyond mere business acquaintances, making it difficult to believe Schlueter was unaware that Brock did not have an appraisal license. And most importantly, it implies that Schlueter had daily and direct involvement in Brock's appraisal work for Midwest. Schlueter attempts to downplay Demaske's declaration by noting that Demaske stopped working for Accupraise a year before Wallace's appraisal. (Doc. # 156 at 2). However, Durham corroborates Demaske's explanation of how the fraudulent appraisal scheme worked and directly ties the scheme to the appraisal of Wallace's home. (Doc. # 150, Ex. E). Based upon these facts, a reasonable juror could conclude that Schlueter willing participated with Brock in a fraudulent appraisal scheme that involved wire fraud and was designed to entice mortgage borrowers into taking out home-refinancing loans.

Unlike with Schlueter, there is nothing in the record that indicates Bates participated in the fraudulent appraisals. There is no testimony that Bates communicated with anyone from Accupraise or that he was involved in the appraisal process. Bates's position as Midwest's vice-president may provide a "scintilla of evidence" that he knew about the appraisal scheme, but that level of evidence is insufficient to create a jury issue. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). Therefore, Bates's motion for summary

judgment on Wallace's § 1962(c) claim is granted. The Court now turns to whether Wallace has established the remaining § 1962(c) elements against Schlueter.

### c. A pattern of racketeering activity

A plaintiff bringing a claim under § 1962(c) must prove that the defendant engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962(c); *In re ClassicStar Mare Lease Litig.*, 727 F.3d at 484. To establish a "pattern of racketeering activity," a plaintiff must show, at a minimum, that the defendant committed two predicate acts within a ten year period. 18 U.S.C. § 1961(5). Additionally, the plaintiff must demonstrate that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

In his Second Amended Complaint, Wallace suggests that Schlueter participated with Brock in preparing over fifty fraudulent appraisals. (Doc. # 132). Schlueter counters that Wallace has presented evidence of only one incident of fraud: his own appraisal. (Doc. # 156 at 6). After reviewing the record, the Court finds that Wallace has submitted evidence of five fraudulent appraisals; specifically, the appraisals – including Wallace's – that are attached to Durham's affidavit. (Doc. #150, Ex. E). Each of those appraisals is for a Kentucky property and lists Midwest as the client. *Id.* They state that the appraiser performed a complete visual inspection of the home and each bears Durham's signature. *Id.* However, Durham asserts that he never visited those properties and never signed the documents. *Id.*

These five alleged acts of wire fraud are related. Racketeering acts are related when they have "similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

13

*H.J. Inc.*, 492 U.S. at 240. All five acts have a similar purpose: to entice Midwest customers into taking out a refinancing loan based on a fraudulent appraisal. Each predicate act had the same players involved: Brock, acting through Accupraise, and Schlueter acting through Midwest. Each act involved the same victim: a Midwest client attempting to obtain a home mortgage. Finally, Schlueter committed each act of wire fraud in the same manner: by having Brock send Midwest fraudulent appraisals through fax or e-mail.

Racketeering acts must not only be related, they must pose a threat of continued criminal activity. Continuity can be established either through a closed-ended pattern or an open-ended pattern. *Id.* at 241-242. A plaintiff can demonstrate a closed-ended pattern of criminal activity "by proving a series of related predicates extending over a substantial period of time." *Id.* at 242. Predicate acts that extend over only a few months are insufficient to establish a closed-ended pattern. *Id.* The number of victims, the number of predicate acts, and whether there is an inherent end to the scheme are all relevant in determining whether there is a closed-ended pattern. *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 134-35 (6th Cir. 1994).

An open-ended pattern can be proven by demonstrating "that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Heinrich*, 668 F.3d at 410. This can be accomplished "by showing that the related predicates themselves involve a distinct threat of long term racketeering activity, either implicit or explicit, or by showing that the predicate acts or offenses are a part of an ongoing entity's regular way of doing business." *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991) (citing *H.J., Inc.*, 492 U.S. at 242). In determining whether there is an

open-ended pattern, a court examines the specific facts of the case and considers the totality of the circumstances surrounding the commission of the racketeering acts. *Id.* Subsequent events are irrelevant, because the threat of continuity is viewed "at the time the racketeering activity occurred." *Heinrich*, 668 F.3d at 410 (citing *Busacca*, 936 F.2d at 238).

Wallace has demonstrated a close-ended pattern. The five predicate acts occurred over a two-year period from September 2006 to August 2008. There are five different victims, and at the time the acts were committed, there was no inherent end to the scheme. As a principal, Schlueter had control over how Midwest conducted its affairs, and the number of home owners seeking refinancing loans from Midwest was potentially infinite. These facts are sufficient as a matter of law to establish a closed-ended pattern. *Compare Brown v. Cassens Transport Co.*, 546 F.3d 347, 355 (6th. Cir. 2008) (holding that thirteen predicate acts spanning "well over three years" was sufficient to constitute a close-ended pattern), *with Vemco, Inc.,* 23 F.3d at 134-35 (holding that a "single criminal episode" that involved one victim and lasted over a seventeen month period did not demonstrate a closed-ended pattern).

Wallace has also established the existence of an open-ended pattern. At the time Schlueter allegedly committed the five predicate acts of mail and wire fraud, the acts were "capable of repetition indefinitely into the future." *Busacca*, 936 F.2d at 238. Demaske states that Accupraise received almost 100% of its business from Midwest. Durham identifies five fraudulent appraisals Midwest ordered from Accupraise in less than two years. This evidence provides a genuine dispute of material fact whether Schlueter's procurement of false appraisals was his "regular way of doing business." *H.J., Inc.*, 492

15

U.S. at 242; *see Heinrich*, 668 F.3d at 411 (holding four predicate acts sufficient to allege open-ended continuity because there was no indication that the racketeering activity would cease); *Busacca*, 936 F.2d at 237–38 (finding that six predicate acts established open-ended continuity because the racketeering activity was capable of repetition indefinitely into the future).  Because Wallace has demonstrated the existence of a genuine dispute of material fact as to each required element of his § 1962(c) claim, Schlueter's motion for summary judgment on that claim is denied.

### 3.    Section 1962(d) Claim

Section 1962(d) makes it unlawful to conspire to violate 18 U.S.C. §§ 1962(a-c).  18 U.S.C. § 1962(d).  To succeed on a § 1962(d) claim, a plaintiff must satisfy all the elements of a RICO violation, in addition to demonstrating "the existence of an illicit agreement to violate the substantive RICO provision."  *Heinrich*, 668 F.3d at 411 (quoting *United States v. Sinto*, 723 F.2d 1250, 1260 (6th Cir. 1983)).  A plaintiff can prove there was an agreement by showing that "the defendant objectively manifested an agreement to participate directly or indirectly in the affairs of an enterprise through the commission of two or more predicate crimes."  *Heinrich*, 668 F.3d at 411 (quoting *Sinto*, 723 F.2d at 1261).

Wallace brings his § 1962(d) claim against Schlueter, Bates, and MortgageIT.  In his Second Amended Complaint, he alleges (1) that Schlueter and Bates conspired with "Accupraise and Brock to generate false appraisals"; and (2) that "Schlueter and Bates conspired with MortgageIT to generate unlawful kickbacks to Midwest . . . and that MortgageIT knew that the appraisals were . . . inflated."  (Doc. # 132 at 26).  The Sixth Circuit held that Wallace has made a sufficient showing of proximate cause and directed this Court to determine whether Wallace had raised a factual dispute on the remaining §

16

1962(d) elements. *Wallace*, 714 F.3d at 719. The Court will examine the two conspiracies separately.

### a. Conspiracy to produce fraudulent appraisals

Schlueter and Bates insist that there is no evidence that they agreed to a fraudulent appraisal scheme. As discussed above, there is a genuine dispute of material fact that Schlueter violated § 1962(c) by ordering false appraisals, but there is no evidence that Bates was involved in that scheme. Those same facts are applicable here and demonstrate that Schlueter conspired to violate the predicate RICO acts of mail and/or wire fraud. In Demaske's declaration, he states that Schlueter spoke with Brock on a near daily basis regarding appraisal work. He further alleges that Midwest would request certain appraisal values and would assist in the appraisal process. Durham identifies five fraudulent appraisals ordered by Midwest. Finally, he states that the appraisals were sent from Accupraise's Ohio office by fax or e-mail to Midwest's Kentucky office. Based on this evidence, a reasonable juror could find that Schlueter agreed with Brock to conduct Midwest's affairs through the commission of more than one act of mail or wire fraud. There is no evidence, however, that Bates agreed to the scheme. Therefore, Schlueter's motion for summary judgment on the § 1962(d) claim alleging a fraudulent appraisal scheme is denied, and Bates's motion for summary judgment on that claim is granted.

The only evidence Wallace cites to establish that MortgageIT participated in the fraudulent appraisal scheme is Margot Saunders's declaration, which standing alone is insufficient to survive summary judgment. In her declaration, Saunders opines that MortgageIT was aware that there were problems with Wallace's appraisal, but that MortgageIT did not address those problems before approving Wallace's loan. (Doc. # 152

17

at 23-24). That opinion may raise a question as to whether MortgageIT had some knowledge that the appraisals were fraudulent, but it does not establish that MortgageIT agreed to or participated in the scheme. *Wallace*, 714 F.3d at 423 (holding that Wallace's theory that MortgageIT agreed to the appraisal scheme is "too attenuated to raise a sufficient question of fact."). Therefore, MortgageIT's motion for summary judgment on this part of Wallace's § 1962(d) claim is granted.

### b. Conspiracy to pay illegal kickbacks

Wallace also argues that Schlueter, Bates, and MortgageIT violated § 1962(d) by agreeing that MortgageIT would pay Midwest illegal kickbacks through the use of the interstate mail and wire systems. (Doc. # 151 at 5). To establish a kickback agreement, Wallace points to rate sheets MortgageIT distributed to Midwest. These rate sheets demonstrate that the premium MortgageIT paid Midwest increased as the interest rate on the loans Midwest secured increased. (Doc. # 150 at 24). Wallace alleges that Schlueter and Bates's goal (acting through Midwest) was to reap the illegal kickbacks, while MortgageIT's goal was to secure high interest loans so that it could resell the loan paper at a profit. (Doc. # 151 at 4).

Both this Court and the Sixth Circuit's analysis of Wallace's state civil conspiracy claim against MortgageIT are relevant. This Court previously held that there was no evidence "that [MortgageIT] entered into an agreement to commit an unlawful act." (Doc. # 176 at 31). The Court recognized that a yield spread premium's legality is determined by comparing the services actually performed by the broker with the compensation paid, and asking whether the two are "reasonably related." *Id.* at 31-32*; see* Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999-1 Regarding Lender

18

Payments to Mortgage Brokers, 64 Fed. Reg. 10080, 10084 (March 1, 1999) ("HUD Policy Statement").  Because Midwest had not yet finished performing its services for MortgageIT at the time MortgageIT disseminated the rate sheets, MortgageIT could not determine *at the time* it agreed to pay the yield spread premiums whether they would be legal. Accordingly, this Court held that neither the rate sheets nor the yield spread premium payments could provide evidence that MortgageIT "conspired to commit an *unlawful* act." (Doc. # 176 at 31).

The Sixth Circuit affirmed this Court's judgment dismissing Wallace's state conspiracy claim against MortgageIT, holding that "the record offers essentially no support for Wallace's contention that MortgageIT manifested an agreement to commit an unlawful act . . . . "  *Wallace,* 714 F.3d at 423.  In its analysis, it stated that this Court was correct in recognizing "'that yield spread premiums are not illegal per se under federal law."  *Id.*  The court found "nothing in the record that suggested MortgageIT conspired to provide a specifically illegal yield spread premium."  *Id.*  It further found that "MortgageIT has no obvious relationship or communications with Midwest Financial outside of the formal application process and payment of such premiums – certainly nothing on the order of an illicit agreement."  *Id.*

For Wallace to survive summary judgment on his § 1962(d) claim that Schlueter, Bates, and MortgageIt engaged in an illegal kickback conspiracy, he must demonstrate that there is a genuine dispute of material fact whether they made an illicit agreement "that *someone* would commit" two predicate RICO acts.  *United States v. Driver*, 535 F.3d 424, 432 (6th Cir. 2008).  However, Wallace's arguments concerning Schlueter, Bates, and MortgageIt conspiring to engage in an illegal kickback scheme consist almost entirely of

conclusory allegations. *See* (Doc. # 151 at 5) ("MortgageIT ... entered into an agreement to pay illegal kickbacks to Midwest. MortgageIT knew the interstate wire and mail systems would be used to facilitate its illegal kickback payments to Midwest."); (Doc. # 249 at 2-3) ("MortgageIT entered into an agreement to pay illegal kickbacks to Midwest. MortgageIT knew the interstate wire and mail systems would be used to facilitate its illegal kickback payments to Midwest."). Wallace points to only two facts to support his claim that Schlueter, Bates, and MortgageIT violated § 1962(d) by agreeing to illegal kickbacks: (1) the rate sheets MortgageIT distributed to Midwest, and (2) the yield spread premium MortgageIT paid Midwest.

As discussed above, the rate sheets and yield spread premium payment are not per se illegal, and under the facts and circumstances of this case, do not provide evidence of a conspiracy. While REPSA prohibits kickbacks, it allows a mortgage lender to pay a broker "for services actually performed in the making of a loan." 12 U.S.C. §§ 2607(a)-(c). Yield spread premium payments are permissible as long as they are "reasonably related" to the value of the broker's services. HUD Policy Statement at 10081, 10084; *Howland v. First American Title Ins. Co.*, 672 F.3d 525, 530-31 (7th Cir. 2012). To determine the value of a broker's services, HUD directs a court to consider services performed both before and at the closing, including (1) whether the broker maintained communications with the borrower and lender between application and *closing*, and (2) whether the broker participated in the *closing*. *See* HUD Policy Statement at 10085.

There is no evidence that, *at the time* MortgageIT distributed the rate sheets, it knew what services Midwest had performed on Wallace's loan. And MortgageIT could not have known what services Midwest would provide at the closing: the rate sheets are dated

August 15, 2006 (Doc. # 149, Ex. P); Midwest closed Wallace's loan on August 18, 2006 (Doc. # 149, Ex. C). Additionally, the 4.197% total compensation MortgageIT agreed to pay Midwest falls in the gray area of what courts have found permissible. *Compare Clifford v. FMF Capital, LLC,* No. 1:06-cv-316, 2007 WL 1701816, at *3 (W.D. Mich. June 11, 2007) (finding 4.35% total compensation "grossly" unreasonable), *with McWhorter v. Ford Consumer Fin. Co.*, 33 F. Supp. 2d 1059, 1068 (N.D. Ga. 1997) (finding 4% compensation reasonable). The rate sheets and yield spread premium payment do nothing to advance Wallace's theory that Schlueter, Bates, and MortgageIT conspired to violate RICO.[3] Accordingly, the Court grants the defendants' motions for summary judgment on Wallace's § 1962(d) claim alleging an illegal kickback conspiracy.

### 4.    Kentucky Civil Conspiracy Claim

To prevail on a civil conspiracy claim, a plaintiff must prove "an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *James v. Wilson*, 95 S.W.3d 875, 897 (Ky. Ct. App. 2002) (citing *Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995)). This requires the plaintiff to show "that the defendants acted tortiously pursuant to a common design, or that they rendered substantial assistance to others to accomplish the tortious act." *Peoples Bank of Northern Ky. v. Crowe Chizek and Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008). A civil

---

[3] In its 2010 Order, this Court denied summary judgment for MortgageIT on Wallace's claim that the yield spread premium was an illegal kickback under REPSA, 12 U.S.C. § 2601(a). (Doc. # 176 at 25). The Court reached its conclusion because of conflicting expert reports that differed on whether the total compensation MortgageIT paid Midwest was reasonable in relation to the services Midwest provided. *Id.* at 24-25. The issue here, however, is not whether the yield spread premium payment *was* illegal, but whether there was an *agreement* to pay an illegal yield spread premium. The conflicting expert reports highlight that determining the legality of yield spread premium payments is a fact-intensive and backward-looking inquiry that makes it difficult for one to engage in a yield spread premium payment conspiracy.

conspiracy claim is one "for damages caused by acts committed pursuant to a formed conspiracy." *Id.*

Civil conspiracy is not a free-standing claim in Kentucky: "[I]t merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." *Christian Cnty. Clerk ex rel. Kem v. Mortg. Elec. Registration Sys., Inc.*, 515 F. App'x 451, 458-59 (6th Cir. 2013) (quoting *Stonestreet Farm, L.L.C., v. Buckram Oak Holdings, N.V.*, Nos. 2008-CA-002389-MR, 2009-CA-000026-MR, 2010 WL 2696278, *13 (Ky. Ct. App. July 9, 2010)).  Therefore, a civil conspiracy claim not based on a tort cannot survive as a matter of law.  *Flint v. Coach House, Inc.*, No. 2012-CA-000580, 2013 WL 869649, *4 (Ky. Ct. App. March 8, 2013) (holding that because the plaintiff had not stated a tort claim, "a cause of action for civil conspiracy cannot lie as a matter of law."); *Stonestreet Farm,* 2010 WL 2696278 at *14 ("Stonestreet's claim of civil  conspiracy thus has no tort to be based upon and cannot survive as a matter of law.").

Wallace's state conspiracy claim alleges that Midwest, Schlueter, and Bates conspired with Brock and Accupraise to produce fraudulent appraisals and that their conspiracy directly harmed him.  (Doc. # 132 at 30).  Midwest, Schlueter, and Bates argue that there is no evidence that they agreed with Accupraise and Brock to commit an unlawful act.

The civil conspiracy claim is the only remaining claim against Midwest.  Wallace agreed to dismiss all other claims against Midwest with prejudice, including his fraud claim. (Doc. # 218).  And now that this Court has found that Bates did not violate RICO, no claims remain against him.  Because Wallace's state civil conspiracy claims against Midwest and Bates have no tort to be based on, their motions for summary judgment on those claims

are granted.  *Ellington v. Federal Home Loan Mort. Corp.*, *6 (W.D. Ky. Mar. 31, 2014) (dismissing a plaintiff's civil conspiracy claim because the court had dismissed the underlying statutory claims).

Unlike Midwest and Bates, RICO claims remain against Schlueter.  "[C]ivil RICO is a statutory tort."  *Kaufman v. BDO Seidman*, 984 F.2d 182, 185 (6th Cir. 1993).  In addressing Wallace's civil RICO conspiracy claim above, this Court determined that a reasonable jury could find that Schlueter agreed with Brock to conduct Midwest's affairs through the commission of more than one act of mail and/or wire fraud.  *Supra*, Part VIII, Subpart(3)(a).  That conclusion was based on Demaske's and Durham's sworn statements that create a genuine dispute as to whether there was a scheme among Schlueter and Brock to produce fraudulent appraisals.  Those sworn statements, in addition to the five appraisals attached to Durham's affidavit,  further create a dispute as to whether Schlueter committed acts in furtherance of the conspiracy; namely, ordering Brock to appraise Wallace's home and exerting influence over the value of that appraisal.  Wallace has demonstrated a genuine issue of fact as to each element of his state conspiracy claim against Schlueter; therefore, Schlueter's motion for summary judgment on that claim is denied.

## III.  CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

1.     Defendant David Schlueter's Motion for Summary Judgment (Doc. # 146) is hereby **GRANTED** on Count II (RICO Conspiracy) as it relates to an illegal kickback conspiracy; and **DENIED** on Counts I (Civil RICO); II (RICO Conspiracy) as it relates to a

fraudulent appraisal scheme; and VII (Civil Conspiracy);

2.      Defendant Bryan Bates's Motion for Summary Judgment (Doc. # 146) is hereby **GRANTED** on Counts I (Civil RICO), II (RICO Conspiracy), and VII (Civil Conspiracy);

3.      Defendant Midwest Financial & Mortgage Services Inc.'s Motion for Summary Judgment (Doc. #146) is hereby **GRANTED** on Count VII (Civil Conspiracy);

4.      Defendant MortgageIT, Inc's Motion for Summary Judgment (Doc. # 149) is hereby **GRANTED** on Count II (RICO Conspiracy).

5.      The remaining parties shall file a **Joint Status Report within twenty (20) days of the date of entry of this Order** setting forth proposed dates for a final pretrial conference and trial and how many days the parties expect the trial to last.

This 19th day of November, 2014.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\Opinions\Covington\2007\2-07-131 MOO 2.wpd